UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

------------------------------------------------------ x
                                    :

CRISTAL JORDAN MUNGIN        :             3:19 CV 233 (RMS)
                                      :

V.                                      :
                                      :

ANDREW SAUL,                :
COMMISSIONER            :
OF SOCIAL SECURITY[1]       :             DATE: FEB. 4, 2020
                                      :
------------------------------------------------------ x

### RULING ON THE PLAINTIFF'S MOTION TO REVERSE THE DECISION OF THE COMMISSIONER, OR IN THE ALTERNATIVE, MOTION FOR REMAND FOR A HEARING, AND ON THE DEFENDANT'S MOTION FOR AN ORDER AFFIRMING THE DECISION OF THE COMMISSIONER

This action, filed under § 205(g) of the Social Security Act, 42 U.S.C. § 405(g), seeks review of a final decision by the Commissioner of Social Security ["SSA"] denying the plaintiff disability insurance benefits ["SSDI"].

## I.    ADMINISTRATIVE PROCEEDINGS

On August 11, 2016, the plaintiff filed an application for SSDI, claiming that she had been disabled since July 1, 2015, due to post-traumatic stress disorder ["PTSD"], anxiety, bipolar disorder II, spondyloarthitis, diabetes, high blood pressure, and asthma. (*See* Certified Transcript of Administrative Proceedings, dated March 27, 2019 ["Tr."] 96-97, 200-03.[2] The plaintiff's application was denied initially and upon reconsideration. (Tr. 121-23, 129-32, 135-37). On

---

[1] The plaintiff commenced this action against Nancy A. Berryhill, as Acting Commissioner of Social Security. (Doc. No. 1). On June 17, 2019, Andrew M. Saul became the Commissioner of Social Security. Because Nancy A. Berryhill was sued in this action only in her official capacity, Andrew M. Saul is automatically substituted for Nancy A. Berryhill as the named defendant. *See* FED. R. CIV. P. 25(d). The Clerk of the Court shall amend the caption in this case as indicated above.

[2] The plaintiff also filed an application for Supplemental Security Income benefits, which was denied, and is not at issue on this appeal. (*See* Tr. 125-27).

January 18, 2018, a hearing was held before Administrative Law Judge ["ALJ"] Matthew Kuperstein, at which the plaintiff and a vocational expert testified. (Tr. 30-94). On March 9, 2018, the ALJ issued an unfavorable decision denying the plaintiff's claim for benefits. (Tr. 8-23). On April 20, 2018, the plaintiff requested review from the Appeals Council (Tr. 198), and on January 22, 2019, the Appeals Council denied the request, thereby rendering the ALJ's decision the final decision of the Commissioner. (Tr. 1-3).

On February 15, 2019, the plaintiff filed her complaint in this pending action (Doc. No. 1), and on February 25, 2019, the parties consented to the jurisdiction of a United States Magistrate Judge. (Doc. No. 9). This case was transferred accordingly. On June 19, 2019, the plaintiff filed her Motion to Reverse the Decision of the Commissioner (Doc. No. 14), with a brief (Doc. No. 14-2 ["Pl.'s Mem."]), exhibits (Doc. Nos. 14-3, 14-4, 14-5), and Statement of Material Facts (Doc. No. 14-1) in support. On August 20, 2019, the defendant filed his Motion to Affirm (Doc. No. 16) and a Statement of Material Facts (Doc. No. 16-1) in support.

For the reasons stated below, the plaintiff's Motion to Reverse the Decision of the Commissioner (Doc. No. 14) is GRANTED such that this case is remanded for additional proceedings consistent with this Ruling, and the defendant's Motion to Affirm (Doc. No. 16) is DENIED.

II.     FACTUAL BACKGROUND

At the time of her hearing in January 2018, the plaintiff was thirty years old, recently divorced from her physically, verbally and mentally abusive ex-husband, and was living with her father. (Tr. 36). Her father helped her dress, cook, remind her "of everything on the calendar[,]" and shop. (Tr. 37).

The plaintiff testified that she did not leave the house because of her panic attacks, which she had three or four times a day, and which "became worse [when she was] working with the public." (Tr. 42). She explained that her boss was understanding, but eventually "the big managers came down on [her boss]" and she was fired. (Tr. 43). While the plaintiff was testifying, the ALJ asked her if she was okay, in response to which she stated, "I have terrible anxiety." (Tr. 39). Consequently, the hearing was twice adjourned for brief breaks. (Tr. 40-41, 63-64).

In addition to her anxiety, the plaintiff suffered from pain in her back, shoulders and neck, which made it hard for her to lift and carry, dress herself, open things, or use her hands. (Tr. 47). She could not pick things up with her hands, she had trouble navigating stairs, and she could only walk about half a block before stopping. (Tr. 56-58). Additionally, the plaintiff testified that she had fibromyalgia, and she suffered from migraines, which her rheumatologist told her resulted from her fibromyalgia. (Tr. 48-50). She had migraines two or three times a week, and they lasted about three hours; when they occurred, she would take medication, go into a dark room and put an icepack over whichever side was "hurting[.]" (Tr. 54). According to the plaintiff, she would spend about seventy-five percent of her day lying in bed. (Tr. 62). She suffered from PTSD, which presented with night terrors and amplified sounds. (Tr. 66-67).

A vocational expert testified that an individual with a tenth grade education, like the plaintiff (*see* Tr. 220), who was limited to light exertional work with occasional climbing, balancing, stooping, kneeling, crouching or crawling, and who was limited to performing simple, routine or repetitive tasks without strict time or production requirements, and who could not work with direct public contact or as a team and who had only brief and superficial interaction with co-workers and supervisors, could not perform the plaintiff's past work as a deli worker at Walmart. (Tr. 80-81). Such an individual could, however, work as a housekeeper, laundry worker, or hand

packager. (Tr. 82-83). If the individual was further limited to sedentary work instead of light work, that individual could perform the work of a finisher, assembler, and surveillance system monitor. (Tr. 84). The vocational expert testified that he relied upon the statistics provided by the Department of Labor, the Occupational Outlook Handbook, and the Occupational Employment Statistics. (Tr. 75-76). He explained that, in his "early years as a vocational expert[,]" he performed "surveys, so that [he] mainly extrapolate[es] that information and numbers through the statistics that [he had] from the Occupational Outlook Handbook and the National Occupational Employment documents." (Tr. 87).

III.    THE ALJ'S DECISION

Following the five-step evaluation process,[3] the ALJ found that the plaintiff last met the insured status requirements through June 30, 2019 (Tr. 13), and that the plaintiff had not engaged in substantial gainful activity since July 1, 2015, the alleged onset date. (Tr. 13, citing 20 C.F.R. § 404.1571 *et seq.*).

At step two, the ALJ found that the plaintiff had the following severe impairments: rheumatoid arthritis, obesity, bipolar II, and PTSD. (Tr. 13, citing 20 C.F.R. § 404.1520(c)). The ALJ concluded that the plaintiff's testimony about migraine headaches was not supported by the record, and her allegation of fibromyalgia was not confirmed by widespread pain or axial skeletal

---

[3] First, the ALJ must determine whether the claimant is currently working. *See* 20 C.F.R. § 404.1520(a)(4)(i). If the claimant is currently employed, the claim is denied. *Id.* If the claimant is not working, as a second step, the ALJ must make a finding as to the existence of a severe mental or physical impairment; if none exists, the claim is also denied. *See* 20 C.F.R. § 404.1520(a)(4)(ii). If the claimant is found to have a severe impairment, the third step is to compare the claimant's impairment with those in Appendix 1 of the Regulations [the "Listings"]. *See* 20 C.F.R. § 404.1520(a)(4)(iii); *Bowen v. Yuckert*, 482 U.S. 137, 141 (1987); *Balsamo v. Chater*, 142 F.3d 75, 79–80 (2d Cir. 1998). If the claimant's impairment meets or equals one of the impairments in the Listings, the claimant is automatically considered disabled. *See* 20 C.F.R. § 404.1520(a)(4)(iii); *see also Balsamo*, 142 F.3d at 80. If the claimant's impairment does not meet or equal one of the listed impairments, as a fourth step, he will have to show that he cannot perform his former work. *See* 20 C.F.R. § 404.1520(a)(4)(iv). If the claimant shows he cannot perform his former work, the burden shifts to the Commissioner to show that the claimant can perform other gainful work. *See Balsamo*, 142 F.3d at 80 (citations omitted). Accordingly, a claimant is entitled to receive disability benefits only if he shows he cannot perform his former employment, and the Commissioner fails to show that the claimant can perform alternate gainful employment. *See* 20 C.F.R. § 404.1520(a)(4)(v); *see also Balsamo*, 142 F.3d at 80 (citations omitted).

pain for a three-month period, nor did she have a confirmed presence of eleven out of eighteen tender points, or at least six fibromyalgia symptoms. (Tr. 14).  Additionally, the ALJ noted that other disorders were not ruled out.  (Tr. 14).

The ALJ concluded at step three that the plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. 14-16, citing 20 C.F.R. §§ 404.1520(d), 404.1525 and 404.1526). He concluded that the plaintiff had the residual functional capacity ["RFC"] to perform light work as defined in 20 C.F.R. § 404.1567(b), except with the further limitations

> to only occasional climbing, balancing, stooping, kneeling, crouching or crawling; to work that involves simple routine and repetitive tasks without strict time or production requirements; to work that does not involve constant direct public contact or teamwork; to work that has only brief and superficial interaction with coworkers or supervisors; and to work in a predictable work routine or setting.

(Tr. 16).

At step four, the ALJ concluded that the plaintiff was unable to perform any of her past relevant work (Tr. 21, citing 20 C.F.R. § 404.1565), but she retained the RFC to perform the work of a housekeeper, laundry worker and hand packager.  (Tr. 22, citing 20 C.F.R. §§ 404.1569 and 404.1569(a)).  Accordingly, the ALJ concluded that the plaintiff was not under a disability at any time from July 1, 2015, through the date of his decision. (Tr. 23, citing 20 C.F.R. § 404.1520(g)).

## IV.    STANDARD OF REVIEW

"In reviewing a final decision of the SSA, this Court is limited to determining whether the SSA's conclusions were supported by substantial evidence in the record and were based on a correct legal standard." *Talavera v. Astrue*, 697 F.3d 145, 151 (2d. Cir. 2012) (citation & internal quotation marks omitted); *see* 42 U.S.C. § 405(g).  The court may "set aside the Commissioner's

determination that a claimant is not disabled only if the factual findings are not supported by substantial evidence or if the decision is based on legal error." *Burgess v. Astrue*, 537 F.3d 117, 127 (2d Cir. 2008) (citation & internal quotation marks omitted); *see also* 42 U.S.C. § 405(g). Substantial evidence is evidence that a reasonable mind would accept as adequate to support a conclusion; it is more than a "mere scintilla." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (citation omitted); *see Moran v. Astrue*, 569 F.3d 108, 112 (2d Cir. 2009) (citation & internal quotation marks omitted). Upon review, is not the court's function to "determine *de novo* whether [the claimant] is disabled." *Schaal v. Apfel*, 134 F.3d 496, 501 (2d Cir. 1998). Rather, the Commissioner's findings are conclusive if supported by substantial evidence and should be upheld even in those cases where the reviewing court might have found otherwise. *See* 42 U.S.C. § 405(g); *see also Beauvoir v. Chater*, 104 F.3d 1432, 1433 (2d Cir. 1997) (citation omitted); *Eastman v. Barnhart*, 241 F. Supp. 2d 160, 168 (D. Conn. 2003).

V.      DISCUSSION

As an initial matter, the plaintiff argues that the ALJ was not properly appointed and lacked authority to hear and decide this claim. (Pl.'s Mem. at 21-24). The plaintiff also claims that the administrative record was not developed as there was no medical source statement that detailed on a function-by-function basis what the plaintiff could and could not do. (Pl.'s Mem. at 1-7). Additionally, the plaintiff argues that the ALJ's step five findings were unsupported in that the vocational expert did not provide adequate support for his estimate of available jobs, and the hypothetical upon which he relied was defective. (Pl.'s Mem. at 8-18). The plaintiff argues also that the ALJ did not evaluate adequately her fibromyalgia and chronic pain. (Pl.'s Mem 18-21).

A.      ALJ'S AUTHORITY TO PRESIDE OVER THIS CASE

The plaintiff seeks a remand of this case under *Lucia v. Securities and Exchange Commission*, 138 S. Ct. 2044 (2018), on the ground that the ALJ was an inferior officer who, at the time of the hearing, was not properly appointed under the United States Constitution's Appointments Clause, and thus, did not have the legal authority to preside over this matter or to issue a decision. (Pl.'s Mem. at 21-24).

This is not the first time this Court has addressed this issue. *See Caruso v. Saul*, No. 3:18 CV 1913 (RMS), 2019 WL 5853257, at *13 (D. Conn. Nov. 8, 2019); *Debiase v. Saul*, No. 3:19 CV 68 (RMS), 2019 WL 5485269, at *4 (D. Conn. Oct. 25, 2019). As the Court discussed in *Debiase*, "in *Lucia*, which was decided on June 21, 2018, the United States Supreme Court . . . held that a "timely challenge" may be made to the "constitutional validity" of the appointment of an officer during the administrative process." 2019 WL 5485269, at *4 (citing *Lucia*, 138 S. Ct. at 2055). The *Lucia* court explained that the remedy for a *timely* challenge to the constitutional validity of the appointment of an ALJ who adjudicates a case is a "new 'hearing before a properly appointed' official[]"; the rehearing, therefore, must be heard by a new, "properly appointed" ALJ. *Lucia*, 138 S. Ct. at 2055 (quoting *Ryder v. United States*, 515 U.S. 177, 182-83 (1995)).[4]

Although there is a split, the majority of courts have interpreted an Appointments Clause challenge to an ALJ in an SSA case to be "timely" if the challenge is raised during the administrative process. *See Bonilla-Bukhari v. Berryhill*, 357 F. Supp. 3d 341, 351 (S.D.N.Y. Mar.

---

[4] The ALJs are now "properly appointed." On July 10, 2018, the President of the United States issued an Executive Order stating that: "perhaps all—ALJs are 'Officers of the United States' and thus subject to the Constitution's Appointments Clause, which governs who may appoint such officials." Exec. Order No. 13843, 83 Fed. Reg. 32755 (July 10, 2018). On July 16, 2018, the Acting Commissioner of Social Security ratified the appointments of all SSA ALJs and approved those appointments as her own, thereby remedying the issue identified in *Lucia*. *See* Social Security Emergency Message (EM) 18003 REV 2, § B (available at: https://secure.ssa.gov/apps10/reference.nsf/links/08062018021025PM); Social Security Ruling 19-1p, 2019 WL 1324866 (S.S.A. Mar. 15, 2019).

4, 2019) (collecting cases).[5] This Court adheres to its previous holdings on this issue, which are in line the decisions published in our Circuit to date. *See, e.g., Bryne v. Berryhill*, No. 3:19 CV 66 (RAR), 2020 WL 373076, at * 2-3 (D. Conn. Jan. 23, 2020); *Kevin F. v. Comm'r of Soc. Sec.*, No. 5:18 CV 1454 (ATB), 2020 WL 247323, at *1 (N.D.N.Y. Jan. 16, 2020); *Demoranville v. Saul*, No. 3:18 CV 1930 (RAR), 2019 WL 6712056, at *2-3 (D. Conn. Dec. 10, 2019); *Caruso*, 2019 WL 5853257, at *13; *Debiase*, 2019 WL 5485269, at *4; *Nestor v. Comm'r of Soc. Sec.*, 19 CV 580 (BNC), 2019 WL 4888649, at *2-3 (E.D.N.Y. Oct. 3, 2019); *McMorris v. Comm'r of Soc. Sec.*, No. 6:18 CV 6118 (DB), 2019 WL 2897123, at *9-11 (W.D.N.Y. Jun. 26, 2019); *Johnson v. Berryhill*, No. 3:17 CV 1651 (VAB), 2019 WL 1430242, at *13-14 (D. Conn. Mar. 29, 2019); *Bonilla-Bukhari,* 357 F. Supp. 3d at 350 (noting that district courts within the Second Circuit have held that the failure to raise an issue with the ALJ waives judicial review, and acknowledging agreement with "the vast majority of courts that have considered this issue following *Lucia* and have concluded that exhaustion before the ALJ is required."); *Lobbe v. Berryhill*, 17 Civ. 5589 (HBP), 2019 WL 1274941, at *19-20 (S.D.N.Y. Mar. 20, 2019). The plaintiff forfeited her Appointments Clause challenge by failing to raise this claim at the administrative level. Accordingly, the Court will not remand this matter based on the plaintiff's Appointments Clause challenge.

B.     DUTY TO DEVELOP THE RECORD

The plaintiff argues that the ALJ had a duty to develop the record because there was no medical source statement in the record that detailed on a function-by-function basis what the

---

[5] There are a limited number of courts, led by the decision in *Bizarre v. Berryhill*, 364 F. Supp. 3d 418 (M.D. Pa. 2019), that have rejected the restrictive interpretation of *Lucia*, holding that an Appointments Clause challenge cannot be waived by failing to raise it at the administrative level. *See Marchant on behalf of A.A.H. v. Berryhill*, No. CV 18-0345, 2019 WL 2268982, at *3 (E.D. Pa. May 28, 2019) (collecting cases).

plaintiff could and could not do. (Pl.'s Mem. at 1-7). Specifically, the plaintiff argues that the record included treatment records from Dr. Sarah E. Olivier-Cabrera from July 1, 2015 to September 22, 2017, APRN David A. Dietrick from July 30, 2015 to at least May 25, 2017, and from Dr. Fotios Koumpouras from May 6, 2016 to at least July 5, 2017, but none of these treating providers authored a medical source statement detailing on a function-by-function basis what the plaintiff could and could not do. (Pl.'s Mem. at 1-2).

On appeal, this Court must "conduct a plenary review of the administrative record to determine if there is substantial evidence, considering the record as a whole, to support the Commissioner's decision and if the correct legal standards have been applied." *Moran*, 569 F.3d at 112 (citation & internal quotations omitted). The issue of whether an ALJ has satisfied his obligation to develop the record is one that "must be addressed as a threshold issue." *Downes v. Colvin*, No. 14 CV 7147 (JLC), 2015 WL 4481088, at *12 (S.D.N.Y. July 22, 2015).

A "hearing on disability benefits is a non-adversarial proceeding," and as such, "the ALJ generally has an affirmative obligation to develop the administrative record." *Perez v. Chater*, 77 F.3d 41, 47 (2d Cir. 1996) (citation omitted). This duty exists even when, as in this case, the claimant was represented by counsel. *Id.* (citation omitted); *see also Burgess*, 537 F. 3d at 128. The Social Security Regulations provide that an ALJ may, but is not obligated to, recontact a treating physician, and should consider doing so when the existing record evidence is inconsistent or insufficient to make a disability determination. 20 C.F.R. § 404.1520b(b)(2)(i) ("We may recontact your medical source."). Thus, the ALJ retains the obligation to "develop the record when additional information is needed due to the vagueness, incompleteness, or inconsistency of the treating source's opinion." *Moreau v. Berryhill*, No. 3:17 CV 396(JCH), 2018 WL 1316197, at *11 n.6 (D. Conn. Mar. 14, 2018) (multiple citations omitted). Accordingly, the issue in this case

is whether there was sufficient evidence in the record from which the ALJ could determine the plaintiff's RFC.

The plaintiff's medical record reflects relatively consistent treatment for both physical and mental impairments.  Prior to the plaintiff's onset date, she was treated for anxiety, polycystic ovarian syndrome, depression and insomnia.  (*See* Tr. 330-67, 374-75, 382-87, 392-417, 471-77). Additionally, on May 22, 2015, the plaintiff was involved in a motor vehicle accident in which she suffered a compression fracture of C6.  (Tr. 464-71).[6]

The plaintiff was first seen by Dr. Olivier-Cabrera at the Cornell Scott Hill Health Center ["Hill Health"] on July 1, 2015, her onset date of disability.  (Tr. 728-33).  Dr. Olivier-Cabrera referred her for a mental health evaluation which was performed at Hill Health on July 8, 2015. (Tr. 734-743). The plaintiff endorsed "symptoms consistent with PTSD diagnosis including frequent nightmares and flashbacks of the [spousal] abuse . . . [,]" and she had a history of abuse from ages six to eight by "dad's girlfriend's nephew." (Tr. 734). The plaintiff had a learning disability in "comprehension and math." (Tr. 739). The mental health evaluation diagnosed her with "Axis 1: PTSD [and] Mood [Disorder] NOS[,] [rule out] Bipolar II[.]" (Tr. 741).

The plaintiff returned to Dr. Olivier-Cabrera on July 28, 2015. (Tr. 721-727).  Her blood pressure was under better control, but she complained of having headaches three times each week. (Tr. 722). The plaintiff disclosed a history of domestic violence with her ex-husband.  (Tr. 722). Dr. Olivier-Cabrera ordered testing to ascertain the cause of the plaintiff's irregular menses and hirsutism. (Tr. 724-725).

---

[6] The MRI revealed spinal canal stenosis, "moderate" at the C5-C6 level and "mild" at C3-C4 and C4-C5. (Tr. 484). It also showed, at C6-C7, "right central disc osteophyte complex resulting in moderate central spinal canal stenosis, contacting the right ventral aspect of the cervical spinal cord . . . indicating of edema and/or compression myelopathy." (Tr. 485). In addition, it indicated, at T3-T4, "[c]entral posterior disc osteophyte complex contacts the central surface of the cervical spinal cord  . . . indicative of edema and/or compressive myelopathy." (Tr. 485).

On July 30, 2015, the plaintiff started medication management under the care of APRN Dietrick. (Tr. 717-720). She reported, "Sleeping issues have been bad lately, hard to get to sleep, racing thoughts. She describe[d] hypervigilance and increase[d] startle response, poor tolerance of crowds and open spaces." (Tr. 717). She preferred "the autonomy of testing to face to face interaction[,]" and she explained that the "process of leaving her husband and the abusive situation ha[d] her both excited and intimidated, having now to learn new skills and parts of herself that she ha[d] not needed for the past [eleven] years." (*Id.*). The plaintiff reported "fairly frequent" "dissociative episodes" and "panic attacks though [those were] infrequent." (*Id.*). She had "[v]ague auditory hallucinations [and] shadows[,]" and APRN Dietrick noted "clear PTSD." (Tr. 718). He prescribed Trazodone and Abilify. (*Id.*).

The plaintiff was seen by a nutritional consultant on August 20, 2015, who encouraged changes to her diet and discussed the importance of regular exercise. (Tr. 705-09). On the same date, APRN Dietrick stopped the Abilify prescription because the plaintiff was "waking with panic attacks[,]" her anxiety increased, and her mood fluctuated. (Tr. 701; Tr. 702-04). Instead, he prescribed Geodon and Vistaril (Tr. 702) and refilled the Trazodone prescription. (Tr. 703).

The plaintiff returned to Dr. Olivier-Cabrera on August 27, 2015. (Tr. 695-700). Her lab results were "all within normal limits except testosterone [was] elevated which, together with hirsutism, irregular menses, intolerance to glucose/diabetes falls into PCOS [polycystic ovary syndrome]." (Tr. 695-96). She had "mild anxiety." (Tr. 697). Dr. Olivier-Cabrera prescribed Metformin and referred the plaintiff to an endocrinologist. (Tr. 697-98).

On September 28, 2015, the plaintiff complained to Dr. Olivier-Cabrera that, twice each week, she had headaches, "mostly [on the] right side, [with] pressure like radiating to neck [and] shoulders, photophobias, nausea/vomiting/flashing scotomas," "lasting hours, intermittent, [with]

no particular triggers." (Tr. 691). Dr. Olivier-Cabrera noted that a "new component of papilledema by ophthalmology brings differential diagnosis to idiopathic intracranial hypertension (pseudomotor cerebrii)." (Tr. 692). She prescribed Imitrex. (Tr. 693).[7]

The plaintiff saw LPC Dana Mongillo-Wetmore at Hill Health on November 23, 2015. (Tr. 676-78). She recommended continued therapy for PTSD. (Tr. 678). At her December 10, 2015 session with LPC Wetmore, the plaintiff reported "recent interpersonal discord triggering trauma memories (nightmares, flashbacks) anxiety and irritability." (Tr. 676).

On December 15, 2015, APRN Dietrick noted that the plaintiff's anxiety level was "very high" and that she was feeling increasingly irritable and frustrated. (Tr. 671). The plaintiff reported that if she took the Geodon during the day, she was tired, but if she took it at night, she could not sleep. (*Id.*). He prescribed Lamictal, Xanax and Trazodone. (Tr. 674-75). When she saw APRN Dietrick again on January 12, 2016, she reported "feeling energized and happy, mood . . . stable. Sleep [was] good, no complaints [that] visit." (Tr. 666). APRN Dietrick refilled Geodon, Lamictal, and other medications. (Tr. 668-670).

On January 20, 2016, the plaintiff reported the "use of coping skills such as cooking and spending time with family." (Tr. 659). On February 1, 2016, LPC Wetmore noted that the plaintiff presented with an "irritable mood . . . reporting feeling unappreciated by [her] boyfriend[.]" (Tr. 651). The plaintiff's irritability followed her anxiety, and she reported experiencing periods of depression with poor appetite, withdrawal, and not taking care of her personal hygiene for about four days. (*Id.*). The plaintiff reported to APRN Dietrick on February 16, 2016 that "she [was] feeling good, moods ha[d] been stable"; she stopped taking Geodon one month prior and her sleep was "good." (Tr. 646).

---

[7] On October 28, 2015, Dr. Olivier-Cabrera saw the plaintiff for a follow up for asthma, diabetes, and hypertension. (Tr. 685-89). On November 10, 2015, APRN Dietrick discontinued Vistaril as too sedating. (Tr. 681-84)

On March 21, 2016, the plaintiff reported to LPC Wetmore that she had "possible dissociative symptoms while going to the grocery store. Report[ed] she remember[ed] feeling anxious and then described periods of blanking out [and] [was] only able to recall bits and pieces of shopping trip." (Tr. 630). At the March 22, 2016 session with APRN Dietrick, he noted that the plaintiff had been "doing well, coping better with her anxiety, [and her] depressive signs/symptoms have not been present[.]" (Tr. 633). The plaintiff saw Dr. Olivier-Cabrera nine days later for follow-up for her diabetes and asthma. (Tr. 624). On April 15, 2016, the plaintiff was seen for "recurrent eye swelling and pain with redness. Patient seen by ophthalmology – who contacted office – concerned for autoimmune; rheumatology panel done RF 16, ESR 29, rest negative. Patient [had] . . . intermittent swelling of right knee and left ankle with some discomfort." (Tr. 617). The plaintiff was referred to a rheumatologist. (Tr. 619).

On April 18, 2016, APRN Dietrick referred to "rheumatoid arthritis, . . . [that was] affecting her eyes[.]" (Tr. 611). The plaintiff's mood was "stable." (Tr. 613).

On May 6, 2016, the plaintiff had an initial rheumatological consultation with Dr. Fotios Koumpouras. (Tr. 603-07). Dr. Koumpouras was "concerned about SpA [Seronegative Spondyloarthropathy]"; he ordered testing and prescribed Celebrex. (Tr. 606). On May 23, 2016, APRN Dietrick noted that the plaintiff's mood and anxiety were "in good control" and stable. (Tr. 577).

The plaintiff returned to Dr. Koumpouras on June 3, 2016. (Tr. 569-71). She had "[p]ain in her joints, low back and spine. Chronic, 1 hour of AM stiffness. No radicular symptoms. Exam without synovitis, but [question of] enthesopathy." (Tr. 570).

On July 7, 2016, APRN Dietrick noted that the plaintiff "had a family gathering three days in a row and had to isolate several times because she was feeling overwhelmed. [The plaintiff]

state[d] that generally she ha[d] been doing well, and [had not] been real anxious. She [was] sleeping well when she [was] in her own house." (Tr. 554). By July 13, 2016, the diagnosis of Bipolar II disorder had been added to her Treatment Plan from Hill Health. (Tr. 548). On July 21, 2016, Dr. Koumpouras ordered a nine-day course of prednisone. (Tr. 455-60).

On August 16, 2016, APRN Dietrick noted that the plaintiff reported "feeling more stable, less mood swings. She [was] coping with anxiety in public places by playing games on her phone. Sleep [was] very good currently." (Tr. 535). He prescribed Xanax for anxiety control. (Tr. 537).

LPC Wetmore and Aleesha Grier-Rodgers, Psy.D. completed the sole medical source statement in the record on August 29, 2016. (Tr. 513-17). As of that time, the plaintiff had been treated since July 13, 2015, and her diagnoses were Bipolar II Disorder and Chronic PTSD. (Tr. 513). Her attention and concentration were impaired with increased stress, and her main complaints were re-experiencing trauma, anxiety, irritability, and relationships. (Tr. 514). Her mood was "generally anxious although periods of depress[ion] were noted." (*Id.*). Her judgment and insight were fair (Tr. 514), and she "sometimes" had a problem using appropriate coping skills; she "frequently" had a problem handling frustration appropriately; and, she had "frequent irritability and poor impulse control with difficulty managing frustration." (Tr. 515).

Additionally, the plaintiff had frequent problems interacting with others in that she reported "increased anxiety in social settings with reduced functioning"; she "sometimes" had a problem focusing long enough to finish simple tasks or activities and persisting in simple activities without interruption from psychological symptoms; and, she had a "diminished ability to focus with increased stress." (Tr. 516). The ALJ assigned "some weight" to this opinion (Tr. 19-20), as reflected in his RFC which limited the plaintiff to simple routine and repetitive tasks without strict time or production requirements, with work that did not involve direct public contact or teamwork,

and that had only brief and superficial interactions with coworkers or supervisors, in a predictable work routine or setting. (Tr. 16).

In September 2016, APRN Dietrick noted that the plaintiff's "mood [had] been down lately, with increased paranoia" and that her sleep had been disrupted. (Tr. 839). The plaintiff returned to Dr. Koumpouras on September 27, 2016. (Tr. 754-759). The prescribed prednisone "caused her sugar to be low and her mood to change[,]" and she complained of pain in the right ankle and wrist, as well as morning stiffness in the back. (Tr. 755). He prescribed Tramadol and listed her diagnoses as Spondyloarthritis, Unspecified Joint Arthralgia, and Fibromyalgia. (Tr. 759).

On October 10, 2016, the plaintiff described feeling short tempered, with increased irritability, and mood fluctuation. (Tr. 848). APRN Dietrick increased Geodon and considered starting an antidepressant at the next visit. (Tr. 848).

The plaintiff was seen by Dr. Olivier-Cabrera on October 31, 2016. (Tr. 853). She told the nurse at Hill Health that she had an anxiety attack fifteen minutes prior to the appointment. (Tr. 853). Her blood pressure was 155/100 and her pulse rate was 96. (Tr. 853). Dr. Olivier-Cabrera noted "Fibromyalgia ? as per rheumatology /taking celecoxib with improvement." (Tr. 854). The plaintiff complained "of stiffness and muscle aches." (Tr. 855). Later in the day, Dr. Olivier-Cabrera stated that the plaintiff's blood pressure was "slightly improved after calming down." (Tr. 856).

On December 6, 2016, the plaintiff returned to Dr. Koumpouras who stated, "Symptomatology today most consistent with fibromyalgia. Initially I thought she may have had SpA but her b27 is negative and her eye disease was episcleritis, not uveitis . . . for ongoing low back pain – check MR to definitely rule out sacroiliitis. Add Gabapentin . . . ." (Tr. 1050). The

MRI ruled out sacroiliitis. (Tr. 1051). The plaintiff complained of persistent pain of lumbar spine and cervical spine, more swelling in the ankles, right knee and hands, and pain in bilateral wrists, right knee, and bilateral ankles. (Tr. 1054). The plaintiff also reported numbness and tingling in her right leg if she sat too long. (*Id.*). The report reflected that the plaintiff "also ha[d] bad DJD [degenerative joint disease] of the cervical spine, particularly given young age." (Tr. 1054).

The next day, on December 7, 2016, the plaintiff reported to APRN Dietrick that she had new diagnoses of fatty liver, fibromyalgia, and degenerative disc disease. (Tr. 858-62). She was feeling depressed and stressed out. (Tr. 853).

APRN Dietrick noted on January 14, 2017 that the plaintiff's "rheumatologist stopped the gabapentin because of increased tremor . . . client is preoccupied by too many medications, too many new diagnoses" (Tr. 863). He prescribed Cogentin to address tremors. (Tr. 865).

The plaintiff returned to Dr. Koumpouras on March 6, 2017. (Tr. 1055-65, 1086-91). Dr. Koumpouras noted that the plaintiff "had an upper endoscopy – demonstrated gastritis and positive for Heliobacter pylori – just completed [ten] day course of Pylera . . . She need[ed] to stop her Geodon and trazadone . . . She decided not to go back on her mental health medications – she ha[d] PTSD, bipolar II, anxiety NOS, insomnia. She ha[d] noted increase pain diffusely – mostly muscles and neck." (Tr. 1086). He noted "diffuse muscle trigger points, . . . decreased [range of motion] lumbar spine and tender cervical and lumbar spinous processes." (Tr. 1088). He described the plaintiff as a "30 year old female with fibromyalgia. . . . Disease control [was] poor." (Tr. 1090).

The plaintiff was seen at the Yale New Haven Hospital Emergency Room on March 27, 2017, following three weeks of progressive intermittent right neck shoulder and arm pain shooting down the arm. (Tr. 1091). Physical therapy was recommended. (*Id.*).

As of May 25, 2017, APRN Dietrick noted that, since the plaintiff had stopped her medications in January, she reported that she was anxious and was having anxiety attacks [four-to-five] times per week." (Tr. 1144). He prescribed Trazadone, Buspar, Geodon, Lamictal. (*Id.*).

The plaintiff returned to Dr. Koumpouras on June 27, 2017 for follow up to treat fibromyalgia and cervical spinal stenosis. (Tr. 1193-98). The plaintiff's pain was "worsening . . . in her upper back in the muscles; she sometimes flare[d]. YSH was abnormal again. . . . She ha[d] some burning sensation and prickling of her feet – present for a couple of weeks. She ha[d] noted swelling of her feet" such that she increased her shoe size by a half size, and her lower back pain "comes and goes." (Tr. 1193). He referred the plaintiff to endocrinology for her thyroid issue and increased her Lyrica dose. (Tr. 1197).

When the plaintiff saw Dr. Olivier-Cabrera on September 22, 2017, she had muscle spasms that started a month prior, which caused her left hand to jerk so she would drop objects. (Tr. 1162). She reported migraine headaches that lasted the past four days, whereas prior to that, she went "almost a whole year without headaches." (Tr. 1163).

The plaintiff argues that, in a case such as this where a claimant has a number of mental and physical impairments, it is "not possible for laypersons to determine from the 'raw medical records' the effects that these conditions had on [the plaintiff's] function-by-function abilities, and such a determination cannot be made without the opinions of the physicians who rendered hands-on treatment." (Pl.'s Mem. at 5). Additionally, the plaintiff argues that "[g]iven that the ALJ has ascribed 'little weight'" to the opinions of the State Agency reviewers who assessed the plaintiff's physical impairments, and given that the record lacks function-by-function assessments from the plaintiff's treating providers, it "is difficult to know exactly what the ALJ relied on." (Pl.'s Mem. at 6). The Court agrees.

Though the defendant contends that the ALJ derived his RFC determination from the opinions of the State agency consultants (*see* Doc. 16 at 2), that contention is not supported by the record. The only two physical assessments in the file are those completed by State agency consultants. (Tr. 100-01, 113-14). S. Williams, M.D. completed the first assessment on September 27, 2016. (Tr. 100-01). Robert Weisberg, M.D. completed the second assessment on November 15, 2016. (Tr. 113-14). Both concluded that the plaintiff was capable of a full range of medium work. (Tr. 100-01, 113-14). The ALJ, however, assigned these opinions little weight. He found that "additional medical evidence received in the course of developing the claimant's case for review at the administrative hearing level, a different interpretation of the earlier records, and evidence in the form of testimony at the claimant's hearing, . . . justifie[d] a conclusion that the claimant's impairments [were] more severe than was concluded by the state non-examining doctors." (Tr. 20). But it is unclear to the Court how the ALJ, who is not a medical professional, reached his conclusion as to what the plaintiff could do despite her impairments.[8]

The defendant argues that the plaintiff's testimony and references in the medical record that she performed household tasks and walked for exercise allowed the ALJ to "reasonably [find] that [the] [p]laintiff could perform the lifting, carrying, sitting, standing, and walking necessary to perform light work and that she could occasionally perform postural maneuvers." (Doc. 18 at 12). It is well settled, however, that "[a]n ALJ is not qualified to assess a claimant's RFC on the basis of bare medical findings[.]" *Wilson v. Colvin*, No. 13-CV-628P, 2015 WL 1003933, at *21 (WD.N.Y. Mar. 6, 2015) (citation omitted). Specifically, "[w]here the medical findings in the

---

[8] For example, the medical records upon which the ALJ claims to have relied consistently reference the plaintiff's BMI which, between 2015 and 2017, ranged from 44.92 (Tr. 1194) to 49.02 (Tr. 1087). Someone with this BMI would be considered to be morbidly obese. (*See* Tr. 569, 603, 624, 695, 722, 728, 853, 1194). The Court cannot discern how the ALJ considered the impact of the plaintiff's obesity, in conjunction with her other physical impairments, on her ability to perform light work with occasional climbing, balancing, stooping, kneeling, crouching or crawling. (Tr. 16).

record merely diagnose [the] claimant's exertional impairments and do not relate those diagnoses to specific residual functional capabilities," as was the case here, then the ALJ "may not make the connection himself." *Id.* (citation omitted).

An RFC is "a medical determination that must be based on probative evidence of record . . . . Accordingly, the ALJ may not substitute his own judgment for competent medical opinion." *Wilson v. Saul*, No. 19: CV 1097 (WWE), 2019 WL 2603221, at *4 (D. Conn. Jun. 25, 2019) (citation & internal quotations omitted). In this case, the ALJ erred by developing an RFC based on his own interpretation of the medical record and the plaintiff's testimony about what she could do. The plaintiff's activities of daily living are only one of many factors in determining a claimant's RFC. *See* 20 C.F.R. § 404.1545(a)(1), (3). Moreover, "although the RFC determination is an issue reserved for the commissioner, *see* 20 C.F.R. § 404.1527(d)(2) . . . , an ALJ is not qualified to assess a claimant's RFC on the basis of bare medical findings, and as a result an ALJ's determination of RFC without a medical advisor's assessment is not supported by substantial evidence." *Pacheco v. Saul*, Civ. No. 3:19 CV 987 (WIG), 2020 WL 113702, at *7 (D. Conn. Jan. 10, 2020) (multiple citations & internal quotation marks omitted) (remanding on the ground that the ALJ's RFC determination lacked support in the record because there was no medical source opinion supporting the ALJ's finding that the claimant could perform sedentary work). In the absence of a functional assessment of the plaintiff, the ALJ reached his RFC determination based on his own interpretation of the medical record. Such action by the ALJ constitutes error.

In the face of such a gap in a record, the ALJ should have fulfilled his duty to develop the record. Indeed, he had "many avenues" to fill the gap in the record: "he could have requested additional information [from the treating providers], obtained a consultative examination, or sought a medical expert opinion." *Martin v. Berryhill*, No. 16 CV 6184 (FPG), 2017 WL 1313837,

at *4 (W.D.N.Y. Apr. 10, 2017) (citation omitted). On remand, the ALJ shall "employ whichever of these methods are appropriate to fully develop the record as to [the plaintiff's] RFC." *Id.*; *see also Moreau*, No. 3:17CV396(JCH), 2018 WL 1316197 at *4 (holding that remand was warranted where the record did not contain any "RFC assessment by a treating physician on which the ALJ could have relied in making an RFC determination").

The Court declines to address the plaintiff's remaining arguments because "'upon remand and after a *de novo* hearing, [the ALJ] shall review this matter in its entirety.'" *Faussett v. Saul*, No. 3:18 CV 738 (MPS), 2020 WL 57537, at *5 (D. Conn. Jan. 6, 2020) (citing *Delgado v. Berryhill*, No. 3:17 CV 54 (JCH), 2018 WL 1316198, at *19 (D. Conn. Mar. 14, 2019) (holding that because the case is "already being remanded for other reasons," and "because [the plaintiff's] RFC may change after full development of the record," the ALJ is likely to need to reconsider the other steps in the five-step analysis)); *see also Pacheco*, 2020 WL 113702, at *8 (holding that, on remand, the Commissioner must address the other claims of error not discussed in the ruling); *Moreau*, 2018 WL 1316197, at *4 ("Because the court finds that the ALJ failed to develop the record, it also suggests that the ALJ revisit the other issues on remand, without finding it necessary to reach whether such arguments would themselves constitute legal error justifying remand on their own.").

VI.  CONCLUSION

For the reasons stated below, the plaintiff's Motion to Reverse the Decision of the Commissioner (Doc. No. 14) is GRANTED such that this case is remanded for additional proceedings consistent with this Ruling, and the defendant's Motion to Affirm (Doc. No. 16) is DENIED.

This is not a recommended ruling. The consent of the parties allows this magistrate judge to direct the entry of a judgment of the district court in accordance with the Federal Rules of Civil Procedure. Appeals can be made directly to the appropriate United States Court of Appeals from this judgment. *See* 28 U.S.C. § 636(c)(3); FED. R. CIV. P. 73(c).

Dated this 4th day of February, 2020 at New Haven, Connecticut.

  /s/Robert M. Spector, USMJ
Robert M. Spector
United States Magistrate Judge